**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| HART INVESTMENT GROUP, LLC<br><br>and<br><br>ALAN PEEL,<br>Plaintiffs,<br><br>v.<br><br>TAYLOR VETERINARY IMAGING, LLC<br>Serve at: F. Kevin Bond<br>Registered Agent<br>8 E. Broadway, Ste. 720<br>Salt Lake City, UT 84111,<br><br>and<br><br>MARK B. TAYLOR,<br>Serve at: 4540 S. Zarahemia Drive<br>Millcreek, UT 84124,<br><br>Defendants. | Case No. 2:25-cv-2552<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs Hart Investment Group, LLC, and Alan Peel, bring this Complaint against Defendants Taylor Veterinary Imaging, LLC, and Dr. Mark B. Taylor.

**THE PARTIES**

1. Plaintiff Alan Peel is a citizen and a resident of Kansas with his primary residence at 10500 Sagamore Road, Leawood, Kansas 66206.

2. Plaintiff Hart Investment Group, LLC ("Hart") is a Kansas limited liability company, active and in good standing, with its principal office and registered office at 10500 Sagamore Road, Leawood, Kansas 66206. Alan Peel is the sole member of Hart. Thus, Hart is a citizen of Kansas.

3. Defendant Taylor Veterinary Imaging, LLC ("TVI") is a Utah corporation with its principal office at 4540 South Zarahemia Drive, Millcreek, Utah 84124, and its registered office is at 8 East Broadway, Suite 720, Salt Lake City, Utah 84111. Dr. Taylor and Hart are members of TVI. Plaintiffs are unaware of the existence of other members.

4. Defendant Dr. Mark B. Taylor ("Dr. Taylor") is a citizen and a resident of Utah with his primary residence at 4540 South Zarahemia Drive, Millcreek, Utah 84124.

## VENUE AND JURISDICTION

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims occurred in this judicial district, including the damages sustained by Plaintiffs. Additionally, Section 8 of the August 1, 2020, Transfer of Business Ownership Agreement between Plaintiffs and Defendants requires all litigation between Dr. Taylor and Hart be resolved in the United States District Court for the District of Kansas.

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (general federal question), and The Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)).

## FACTS COMMON TO ALL COUNTS

7. Defendant Dr. Taylor is a veterinarian specializing in radiology.

8. Peel and Dr. Taylor are cousins and were close throughout their lives.

9. This case arises out of Defendants' materially false and misleading statements to Plaintiffs regarding a business started and owned by Plaintiffs and Dr. Taylor.

10. Dr. Taylor took advantage of Peel, acquired Hart's ownership interests through false and misleading statements, and continues to deny Plaintiffs' right to compensation.

### The Launch of TVI.

11. Dr. Taylor is veterinarian trained in emergency veterinary medicine and ultrasound.

12. Following Dr. Taylor's completion of a diagnostic imaging residency in 2019, Dr. Taylor approached Peel to start an animal teleradiology business.

13. Dr. Taylor asked Peel to handle some of the business aspects of the company, including setting up the entity, keeping the books, and helping with operations. Dr. Taylor would generate business, negotiate agreements with clients, and handle the medical side by reading and interpreting images.

14. Dr. Taylor proposed an ownership split for the new company of 8% for himself and 20% for Peel.

15. TVI was formed on April 7, 2020, and Dr. Taylor and Peel made initial contributions to TVI at $100 each.

16. Peel worked to get the company started, including completing the filing paperwork to establish TVI as an LLC, setting up QuickBooks to track the company's revenue and expenses, opening the company bank account, and setting up a post office box in his hometown so he could handle bills.

**<u>The Operating Agreement and Amendments.</u>**

17. TVI's Operating Agreement was signed by all parties and effective April 7, 2020.

18. Although the Operating Agreement provided Peel with a vote in some instances, Dr. Taylor effectively controlled TVI from the beginning.

19. Shortly after TVI was established, Dr. Taylor instituted a number of changes to the ownership and distribution structure of TVI, requiring multiple agreements and amendments, including:

a. On August 1, 2020, via a Transfer of Business Ownership Agreement:

i. Dr. Taylor transferred 76% of his 80% ownership to Peel to avoid violating a non-compete agreement he had with another company.

ii. Peel transferred his 96% ownership (his original 20% and the additional 76%) to his company Hart Investment Group, LLC.

iii. Distributions to Dr. Taylor would be 60% of the previous month's revenue, paid monthly.

iv. Distributions to Hart would be 15% of the previous month's revenue, paid monthly.

b. On August 7, 2020, via an Amendment to Transfer of Business Ownership Agreement:

i. Distribution to Dr. Taylor would be $500 each month.

ii. Distribution to Hart would be 15% of the previous month's revenue.

c. On May 10, 2021, via a Member Distributions Amendment:

i. Dr. Taylor's distribution changed to 35% of sales.

ii. Hart's distribution changed to 35% of sales.

d. On January 4, 2022, via a Transfer of Business Ownership Agreement:

i. Seventy-One percent of the Plaintiffs' ownership was transferred back to Dr. Taylor, leaving Dr. Taylor with 75% ownership and Hart with 25% ownership.

ii. Distribution to Dr. Taylor changed to 45% of revenue.

iii. Distribution to Hart changed to 25% of revenue.

iv. Statement that $2,700 in unpaid distributions from 2021 sales should be paid to both parties by December 31, 2022.

e. On February 8, 2022, via a Transfer of Business Ownership Agreement:

i. The 71% ownership transfer from Plaintiffs to Dr. Taylor is restated.

ii. Hart's distribution is changed to be based on the prior month's revenues and:

1. if that revenue is below $5,000, then Hart receives a distribution of revenues less the prior month's expense;

2. if that revenue is between $5,000 and $12,000, then Hart receives a distribution of $3,000;

3. if that revenue exceeds $12,000, then Hart receives a distribution of 25% of the revenue.

i. Dr. Taylor's distribution is changed to be based on the prior month's revenues and:

1. if that revenue is below $5,000, then Dr. Taylor shall not receive a distribution;

2. if that revenue exceeds $5,000, then Dr. Taylor receives a distribution of 70% of the prior month's revenues less the distribution paid to Hart.

f. Both parties agree that a minimum of 30% of revenue from the previous month will be held in an account.

g. Restatement that $2,700 in unpaid distributions from 2021 sales should be paid to both parties by December 31, 2022.

h. On May 2, 2022, via an Amendment to Ownership Agreement:

i. Dr. Taylor's distributions changed to 55% of the previous month's revenue.

ii. Hart's distributions changed to 15% of the previous month's revenue.

iii. Both parties are guaranteed no less than $3,000 each month.

iv. Restatement that $2,700 in unpaid distributions from 2021 sales should be paid to both parties by December 31, 2022.

20. Throughout the many changes in distribution amounts, Peel continued to dedicate significant time and resources to the operations and bookkeeping of TVI. The entire time, Peel's compensation was tied solely to TVI's sales or revenue, which was dictated by Dr. Taylor's services. Peel did not receive a salary or other payment beyond distributions.

21. Over time, Dr. Taylor made it clear he expected Peel to work more hours without any corresponding increase in distribution or other form of compensation. He increasingly treated Peel more like an employee rather than the business partner Peel actually was.

22. Peel also had to step back from helping another family member because managing the operations for TVI was a full-time job. Peel trusted Dr. Taylor, following his lead deferring to Dr. Taylor's directives.

**Dr. Taylor Begins to Push Peel Out of TVI.**

23. TVI was immediately successful. Revenues climbed and grew to approximately $400,000 in 2022.

24. From the beginning, Peel performed multiple roles for TVI. His title was chief financial officer, and Peel also took on various administrative duties. Peel's only compensation for his efforts was indirect through membership distributions paid to Hart—Peel did not receive a

salary or hourly payment, despite being treated as an employee by Dr. Taylor. During most of this time, Peel's compensation was 15% of revenue.

25. In 2022, Dr. Taylor began to place increased pressure on Peel to disregard other commitments, including his passion of coaching high school boys' basketball, and devote more time to TVI. Subjected to Dr. Taylor's pressure, Peel performed a significant amount of unpaid work on behalf of TVI.

26. As an example of Dr. Taylor's influence, Peel traveled to Las Vegas at his own expense and on his own time to attend a basketball coaches' clinic in May 2022. Dr. Taylor knew Peel was attending the clinic, but repeatedly demanded that he monitor the TVI website for incoming patients on a weekend, causing Peel to miss most of the clinic and perform hours of unpaid work.

27. While demanding that Peel commit more time to TVI, Dr. Taylor was looking for opportunities to push Peel out.

28. Dr. Taylor began speaking with Patterson Companies in 2023 regarding a potential sale and worked with Ohio National Financial Services to perform a valuation of TVI. In June 2023, Ohio National valued TVI at more than $5.3 million.

29. In 2023, TVI's revenue exceeded $1 million, and more than doubled in 2024.

30. On September 14, 2023, Dr. Taylor demanded that Peel step back from his basketball coaching duties for a year so he could work full time for TVI –without offering to pay Peel a salary for taking on the additional work.

31. Dr. Taylor continued to exercise his power over Plaintiffs and TVI when he emailed Peel on September 23, 2023, informing him that Plaintiffs' distribution would be reduced starting

on October 1. These actions were aimed at reducing the value of Plaintiffs' ownership to convince him to sell.

32. The September 23, 2023, email also noted that "if you were truly a partner, then no matter what the split, you would have to put in the same hours or more as me" and expressed that Dr. Taylor was "still giving [Plaintiffs] 15% because I am amazing" and went on to say:

> [C]onsider the 15% as:
>
> 1) more than generous considering the amount of work [Peel] puts in each week.
> 2) a way for [Dr. Taylor] to work less (and be less grumpy) Let's face it, I need the money more than you with kids, divorce, attorneys, chapter 13, travel fees to Florida to see my kid, etc.
> 3) a blessing because you are getting all this money and you can still do your sports (without me frowning)
> 4) a way in which to contemplate how awesome I am! Yaaaaaaay! Yes, you can contemplate this every day if you want.
> 5) you can dream about how wonderful I am too.
>
> So, if you really think about this, there would be no reason to be grumpy or even disappointed. Right? You don't work even 1/10 of what I do but you are still getting 15%! It is like I am just giving you money for almost no reason. Our revenue is increasing each month so you won't even notice a less amount on your paycheck.
>
> Finally, this reduction is only until we sell to Patterson.
>
> As the Cherokee chief from Dances with Wolves said, "I have spoken"
>
> -Super Awesome Cousin

33. Dr. Taylor sent this email as part of an effort to undermine and suppress the value of Peel's contributions to TVI and his role as a partner and owner of TVI. Peel believed in TVI, and believed that his cousin had Peel's best interest at heart, so he did not push back and instead agreed to do the extra work.

34. Dr. Taylor intended to create a narrative that anything Peel had received in distributions from TVI was a result of Dr. Taylor's efforts and generosity, not a result of Plaintiffs' ownership in, or effort supporting, TVI.

35. Despite the protestations of Dr. Taylor, Peel was not required to provide any services to TVI. Hart owned shares and was entitled to distributions under the Operating Agreement and other agreements. However, Dr. Taylor ignored those agreements in an effort to convince Plaintiffs to abandon their rights and ownership.

36. Peel heard very little about the sale of TVI to Patterson throughout the rest of 2023.

37. In January 2024, Dr. Taylor told Peel that Patterson was only interested in purchasing TVI if Dr. Taylor had full ownership. Upon information and belief, the information relayed by Dr. Taylor was false. The information provided by Dr. Taylor meant that Dr. Taylor needed to buy Hart out of its ownership share.

38. Peel did not want to sell Hart's shares in TVI. During the conversations between himself and Dr. Taylor, Peel expressed reservations about selling the shares. Dr. Taylor reassured Peel that it would not impact his income. Dr. Taylor promised that he would compensate Peel fairly for his ownership interest after the Patterson deal and employ him at $35 per hour for up to 80 hours per two-week pay period.

39. Dr. Taylor further promised Peel that he would not lose money and would always have a job with TVI.

40. Dr. Taylor also told Peel in that conversation that selling his shares would allow the business to grow beyond anything the two of them could do, and that they could make millions if they did this.

41. Dr. Taylor reiterated this, including the promise to keep Peel employed by TVI, in a January 4, 2024, email to Peel's mother, Marti Peel—who is also Dr. Taylor's maternal aunt—stating in part:

> Hello aunt Marti- I wanted to call but it is late.
>
> My attorneys went over the business valuation and said the one that was done for free was crap. Basically, I don't have any assets/ capital, I don't have a single contract with any client, I don't have other full time radiologists. Both of them said the only value in the business is me. No one else brings in money. If I don't read no one gets paid. Thus, if someone wants to purchase tvi they would only be buying me with a lengthy employment agreement.
>
> The company that employed me during my residency sold for lots of money. However, they had 7 radiologists, several 100k servers and redundant servers in Florida in case there was a system crash. They had serious infrastructure including a residency program with 6 computer terminals. They also owned the whole building.
>
> It is frustrating, but l have to make some changes. The time off I have is expensive and doesn't allow me really much breathing room because Dr Bassett takes 65% of all production for the day. If I don't have days off per week then Jane has told me she is going to make some changes. I wasnt working this much when she met me and she has reservations about moving forward.
>
> There is a company that wants to buy tvi (me and only me). They already have radiologists so if I wanted a day off I would still get paid. They want me to work 4 days a week and not 7. So what ever they offer is just for me – they don't want anything else.
> They want a clean title per se and will move forward with me if I have 100% of shares. So, I need to buy Alan out. I will employ him like before until everything is finalized. lt could take a while.
>
> My attorney said if I want to be generous then 20k is as high as he wants me to go. He explained that I started this just for him and reminded me that Alan did not sweat equity in shares or contribute the revenue stream of the business. He really doesn't want me to offer anything but that is his job to protect my interests.
>
> So, jessica (the coo) who helped develop vital rads (the company for which I worked) and I will need to explain this to Alan tomorrow.
>
> I kind of grew this into a monster and now the monster is destroying me. I have held on as long as I could. I doubt Alan will understand that I did this only for him and understand why I have to make changes. He sees things as black and white.

> There is a Chinese proverb that says if you help someone a little bit they will appreciate it. If you help someone a lot they expect it.
>
> I don't have any guilt. I think I did a goid (sic) thing. Plus, I am too tired... I fall asleep while dictating reports. I feel like I have covid... so tired all the time. I think I really helped Alan out for as long as I could. But I want Jane in my life and she doesn't want this kind of 7 day a week life.
>
> Do you understand?
>
> Mark

42. Dr. Taylor's January 4, 2024, communications to Marti Peel were intended to spread misinformation about a potential sale of TVI to Patterson, and to continue to undermine Peel's efforts and contributions to TVI so that Dr. Taylor could buy out Hart's shares at a vastly discounted price. It also shows that TVI's revenue is, and always was, reliant on Dr. Taylor's expertise.

43. Peel is autistic. Dr. Taylor has known this for years and was aware at all relevant times of Peel's autism. Dr. Taylor knew of Peel's deep trust in him and used that knowledge to control Peel and ultimately swindle Peel out of his ownership stake and potentially millions of dollars.

44. On January 8, 2024, at the direction of Dr. Taylor, TVI employee Jessica Cravens told Peel that TVI was worth "zero."

45. This initially did not make sense to Peel because he was aware of the Ohio National Financial Services valuation in 2023.

46. When Peel questioned the assertion that TVI was worth nothing in light of the 2023 valuation, Ms. Cravens said the valuations did not matter since TVI had no assets and was reliant on Dr. Taylor's efforts and entrepreneurship. This echoed Dr. Taylor's statements to Marti Peel

that the previous valuation was useless, in part, because he was the primary—perhaps the only—driver of business and value for the company.

47. Ms. Cravens also told Peel that Dr. Taylor was going to pay Hart $20,000 for 20% of the shares it held in TVI, and that Hart was required to sell the shares to remain involved with TVI.

48. In this conversation, Ms. Cravens also restated what Dr. Taylor had said months earlier—that Patterson would only purchase TVI if Dr. Taylor was the sole owner. Upon information and belief, that statement was false.

49. After the conversation between Peel and Ms. Cravens, Peel talked with Dr. Taylor about Dr. Taylor's proposal to pay Hart $20,000 for a 20% share in TVI.

50. Dr. Taylor assured Peel that selling the shares was just a formality that was required in order to close the deal with Patterson.

51. Dr. Taylor again promised Peel that he would not lose money and would always have a job with TVI.

52. Dr. Taylor's ultimate goal was to push Peel out of the business for minimal cost so that Dr. Taylor could keep all profit for himself, whether via a sale of TVI or by continuing to operate TVI as sole owner and not sharing profits or distributions with Hart.

53. Dr. Taylor controlled the dissemination of information regarding Patterson's interest in TVI, including any valuation and potential deal terms.

54. Dr. Taylor continued his campaign to convince Peel that TVI's business was weak and threatened. On or about January 10, 2024, Dr. Taylor stated that he needed a separate practice to hire him, indicating that TVI would suffer a loss in revenue and further amplifying TVI's reliance on Dr. Taylor as the driver of revenue.

**Peel Is Stripped of His Ownership Interest, Demoted, and, Shortly Thereafter, Fired.**

55. After Dr. Taylor and Ms. Cravens convinced Peel that his/Hart's ownership in TVI was worth little to nothing, Peel signed a Redemption Agreement on January 20, 2024, selling 20% of Hart's interest in the common shares of TVI to Defendants.

56. Despite his reservations at selling the shares, Peel trusted Dr. Taylor and agreed to sell Hart's shares, completely relying on Dr. Taylor's statements that Peel "would always have a job" and that once the deal with Patterson went through, they could "make millions."

57. After selling the shares, Peel was made an hourly employee.

58. Peel continued to support TVI and help it grow while the alleged sale of TVI to Patterson was still in negotiations.

59. Shortly after pushing Peel to sell Hart's shares of TVI, Dr. Taylor finalized a deal with Patterson in March 2024, the details of which were not shared with Peel.

60. Dr. Taylor fabricated or exaggerated issues involving valuation of TVI and potential sale to Patterson to put pressure on Peel to relinquish Hart's shares in TVI.

61. Despite Dr. Taylor's promises of employment and significant financial gain, things only worsened for Peel. Dr. Taylor demoted Peel throughout 2024, stripping away all of Peel's responsibilities and involvement with the company. Dr. Taylor singled out Peel, demanding he perform tasks that were not required of other employees. For example, Peel was required to fill out timesheets tracking his activities down to the minute.

62. On December 12, 2024, Peel received an email from Ms. Cravens, TVI's Chief Operating Officer, stating that Peel was being demoted to part-time chief data analyst effective January 1, 2025. The email came out of the blue. Peel had no warning or even an inkling that Dr. Taylor was considering demoting him.

63. Peel was also informed in the email that Sarah Grace (Gracie) Nolen would become chief financial officer, and that Peel was required to hand over all financial duties and responsibilities by December 31, 2024.

64. On December 13, 2024, Peel emailed Dr. Taylor and Ms. Cravens several questions about the demotion, including a request for the position to be full time, questions to clarify points in the new job description, and requested adjustments to working hours and duties.

65. After three days of no response, Peel followed up on December 16, 2024, to ask if they reviewed his questions.

66. Late that night, Dr. Taylor finally responded saying, "Yes Jessica will send you her response. She is in charge. I am a lowly person."

67. Ms. Cravens responded to the email only to reiterate that Peel was only needed in a part-time capacity at 15 hours per week. This was later amended to 20 hours per week, but was never increased.

68. On January 10, 2025, Peel was fired by TVI, effective the same day. Dr. Taylor made the decision to terminate Peel. The termination was announced to Peel by Ms. Cravens on a recorded Zoom call with Ms. Nolen present.

69. In a follow-up email, Peel was told that he should continue to report and deposit any client checks that he receives, and that these actions do not require significant time or effort. In other words, the expectation was that he continue to work for TVI but would not get paid to do so.

70. In the weeks after being fired, Peel continued to receive emails, text messages, and phone calls from Dr. Taylor with increasingly threatening and hostile tone and language.

71. Dr. Taylor continued to ask Peel to perform various functions for TVI without compensation.

72. Multiple times Dr. Taylor threatened "consequences" if Peel did not respond or complete a task to Dr. Taylor's satisfaction.

73. TVI is now a multi-million dollar company with five veterinarians, one veterinary sonographer, and at least five support staff, offering teleradiology services in all 50 states and Canada (https://www.taylorveterinaryimaging.com/meet-the-staff).

74. Defendants' materially false and misleading representations regarding the value, strategy, and financial outlook of TVI caused Plaintiffs to lose millions of dollars in distributions and the value of membership interests in TVI.

## COUNT I – VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 (15 U.S.C. § 75j(b))

(Hart vs. Defendants)

75. Plaintiffs incorporate the previous paragraphs as if fully set forth here.

76. Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly, to act in a way that is manipulative or deceptive in connection with the purchase or sale of any security, including any investment contract.

77. The Securities and Exchange Commission promulgated regulations at 17 C.F.R. § 240.10b-5 ("Rule 10b-5") implementing Section 10(b), and making it clear that it is unlawful for any person, directly or indirectly,

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

78. Section 10(b) and Rule 10b-5 apply to Defendants' false and misleading statements made in furtherance of the purchase of Hart's ownership interest in TVI.

79. Dr. Taylor affirmatively, intentionally, and falsely represented to Peel that Hart was required to sell its ownership interest for the sale of TVI to Patterson to be possible.

80. Dr. Taylor affirmatively, intentionally, and falsely represented to Peel that if he sold Hart's shares in TVI, Peel would always have a job at TVI and he would not suffer financially from the sale.

81. TVI and Dr. Taylor affirmatively, intentionally, and falsely represented the weakness of TVI's business to Peel, including that TVI was worth "zero" and that there were no assets.

82. Those facts are material to the value of Hart's membership interest in TVI.

83. Dr. Taylor knew these material facts were false when he made the statements or caused the statements to be made.

84. Dr. Taylor knew that TVI was worth more than "zero" and knew that statement was false when he directed Ms. Cravens to relay that fact to Peel. Dr. Taylor knew it was false because he was in negotiations with TVI and, upon information and belief, knew the price Patterson was offering to purchase TVI.

85. Dr. Taylor knew that his representations of critical material facts were not true, and his misrepresentations were intended to mislead Peel in order to induce him to sell Hart's ownership share of TVI to Dr. Taylor for much less than the ownership interest was worth.

86. Peel, in ignorance of the falsity of Dr. Taylor's statements concerning material facts and in reasonable reliance on Dr. Taylor's statements, acted reasonably and was thereby induced to agree to sell 20% of Hart's membership interests to Dr. Taylor for only $20,000.

87. Defendants procured the sale of Hart's shares through fraudulent acts, which damaged Hart in the form of lost distributions and lost membership value.

88. Hart was injured by this and damaged in an amount greater than $75,000.

89. Additionally, the 2024 Redemption Agreement was procured by undue influence and fraud and is, therefore, unenforceable. Hart requests that this Court declare the 2024 Redemption Agreement null and void, rescind and cancel the agreement, restore Hart to its previous ownership in TVI, and for further relief as determined by the Court.

**COUNT II – VIOLATION OF THE KANSAS SECURITIES ACT**
**(K.S.A. § 17-12a501)**
(Hart vs. Defendants)

90. Plaintiffs incorporate the previous paragraphs as if fully set forth here.

91. Section 17-12a501 makes it unlawful for any person, directly or indirectly, to act in a way that is manipulative or deceptive in connection with the purchase or sale of any security, including any investment contract. That section mimics the restrictions found at 17 C.F.R. § 240.10b-5, which apply to Defendants' statements made in furtherance of the purchase of Hart's ownership interest in TVI.

92. Dr. Taylor affirmatively, intentionally, and falsely represented to Peel that Hart was required to sell its ownership interest for the sale of TVI to Patterson to be possible.

93. Dr. Taylor affirmatively, intentionally, and falsely represented to Peel that if he sold Hart's shares in TVI, Peel would always have a job at TVI and he would not suffer financially from the sale.

94. TVI and Dr. Taylor affirmatively, intentionally, and falsely represented the value of TVI to Peel, including that TVI was worth "zero" and that there were no assets.

95. Those facts are material to the value of Hart's membership interest in TVI.

96. Dr. Taylor knew these material facts were false when he made the statements.

97. Dr. Taylor knew that TVI was worth more than "zero" and knew that statement was false when he directed Ms. Cravens to relay that fact to Peel. He knew it was false because he was in negotiations to sell TVI and, upon information and belief, knew the price Patterson was offering to purchase TVI.

98. Dr. Taylor knew that his representations of critical material facts were not true, and his misrepresentations were intended to mislead Peel in order to induce him to sell Hart's ownership share of TVI to Dr. Taylor for much less than the ownership interest was worth.

99. Peel, in ignorance of the falsity of Dr. Taylor's statements concerning material facts and in reasonable reliance on Dr. Taylor's statements, acted reasonably and was thereby induced to agree to sell 20% of Hart's membership interests to Dr. Taylor for only $20,000.

100. Defendants procured the sale of Hart's shares through fraudulent acts, which damaged Hart in the form of lost distributions and lost membership value.

101. Hart was injured by this and damaged in an amount greater than $75,000.

**COUNT III – VIOLATION OF THE UTAH SECURITIES ACT**
**(U.C.A. § 61-1-1)**
(Hart vs. Defendants)

102. Plaintiffs incorporate the previous paragraphs as if fully set forth here.

103. Section 61-1-1 makes it unlawful for any person, directly or indirectly, to act in a way that is manipulative or deceptive in connection with the purchase or sale of any security, including any investment contract. That section mimics the restrictions found at 17 C.F.R. § 240.10b-5, which apply to Defendants' statements made in furtherance of the purchase of Hart's ownership interest in TVI.

104. Dr. Taylor affirmatively, intentionally, and falsely represented to Peel that Hart was required to sell its ownership interest for the sale of TVI to Patterson to be possible.

105. Dr. Taylor affirmatively, intentionally, and falsely represented to Peel that if he sold Hart's shares in TVI, that Peel would always have a job at TVI and he would not suffer financially from the sale.

106. TVI and Dr. Taylor affirmatively, intentionally, and falsely represented the value of TVI to Peel, including that TVI was worth "zero" and that there were no assets.

107. Those facts are material to the value of Hart's membership interest in TVI.

108. Dr. Taylor knew these material facts were false when he made the statements.

109. Dr. Taylor knew that TVI was worth more than "zero" and knew that statement was false when he directed Ms. Cravens to relay that fact to Peel. He knew it was false because he was in negotiations to sell TVI and, upon information and belief, knew the price Patterson was offering to purchase TVI.

110. Dr. Taylor knew that his representations of critical material facts were not true, and his misrepresentations were intended to mislead Peel in order to induce him to sell Hart's ownership share of TVI to Dr. Taylor for much less than the ownership interest was worth.

111. Peel, in ignorance of the falsity of Dr. Taylor's statements concerning material facts and in reasonable reliance on Dr. Taylor's statements, acted reasonably and was thereby induced to agree to sell 20% of Hart's membership interests to Dr. Taylor for only $20,000.

112. Defendants procured the sale of Hart's shares through fraudulent acts, which damaged Hart in the form of lost distributions and lost membership value.

113. Hart was injured by this and damaged in an amount greater than $75,000.

**COUNT IV – FRAUD**
(Hart vs. Defendants)

114. Plaintiffs incorporate the previous paragraphs as if fully set forth here.

115. Dr. Taylor affirmatively, intentionally, and falsely represented to Peel that Hart was required to sell its ownership interest for the sale of TVI to Patterson to be possible.

116. Dr. Taylor affirmatively, intentionally, and falsely represented to Peel that if he sold Hart's shares in TVI, Peel would always have a job at TVI and he would not suffer financially from the sale.

117. TVI and Dr. Taylor affirmatively, intentionally, and falsely represented the value of TVI to Peel, including that TVI was worth "zero" and that there were no assets.

118. Dr. Taylor knew these material facts were false when he made the statements.

119. Dr. Taylor knew that TVI was worth more than "zero" and knew that statement was false when he directed Ms. Cravens to relay that fact to Peel. He knew it was false because he was in negotiations to sell TVI and, upon information and belief, knew the price Patterson was offering to purchase TVI.

120. Dr. Taylor knew that his representations of critical material facts were not true, and his misrepresentations were intended to mislead Peel in order to induce him to sell Hart's ownership share of TVI to Dr. Taylor for much less than the ownership interest was worth.

121. Peel, in ignorance of the falsity of Dr. Taylor's statements concerning material facts and in reasonable reliance on Dr. Taylor's statements, acted reasonably and was thereby induced to agree to sell 20% of Hart's membership interests to Dr. Taylor for only $20,000.

122. Defendants procured the sale of Hart's shares through fraudulent acts, which damaged Hart in the form of lost distributions and lost membership value.

123. Hart was injured by this and damaged in an amount greater than $75,000.

## COUNT V – NEGLIGENT MISREPRESENTATION
(Hart vs. Defendants)

124. Plaintiffs incorporate the previous paragraphs as if fully set forth here.

125. Dr. Taylor represented to Peel that Hart was required to sell its ownership interest for the sale of TVI to Patterson to be possible.

126. Dr. Taylor represented to Peel that if he sold Hart's shares in TVI, Peel would always have a job at TVI and he would not suffer financially from the sale.

127. TVI and Dr. Taylor falsely represented the value of TVI to Peel, including that TVI was worth "zero" and that there were no assets.

128. Dr. Taylor knew that his representations were not true, and he was careless and negligent in making such representations of material facts to mislead Peel.

129. Dr. Taylor knew, or should have known, that TVI was worth more than "zero" and knew, or should have known, that statement was false when he directed Ms. Cravens to relay that fact to Peel. He knew, or should have known, it was false because he was in negotiations to sell TVI and knew, or should have known, the price Patterson was offering to purchase TVI.

130. Dr. Taylor knew, or should have known, that his representations of critical material facts were not true, and his misrepresentations were intended to mislead Peel in order to induce him to sell Hart's ownership share of TVI to Dr. Taylor for much less than those shares were worth.

131. Peel, in ignorance of the falsity of Dr. Taylor's statements concerning material facts and in reasonable reliance on Dr. Taylor's statements, acted reasonably and was thereby induced to agree to sell 20% of Hart's shares to Dr. Taylor for only $20,000.

132. Defendants procured the sale of Hart's shares through his negligent acts, which damaged Hart in the form of lost distributions and lost share value.

133. Hart was injured by this and damaged in an amount greater than $75,000.

**COUNT VI – BREACH OF CONTRACT**
(Hart vs. Defendants)

134. Plaintiffs incorporate the previous paragraphs as if fully set forth here.

135. The Amendment to Ownership Agreement effective May 2, 2022, is a valid and enforceable contract that is binding against Dr. Taylor and TVI, and which expressly states that Hart would receive 15% of revenues, to be paid monthly, based on the revenues of the previous month.

136. Section 5.2 of the Operating Agreement guarantees that "[w]henever in this Agreement reference is made to the decision, consent, approval, judgment, or action of the Members, unless otherwise expressly provided in this Agreement, such decision, consent, approval, judgment, or action shall mean a Majority of Members."

137. This guaranteed each Member an equal say in decisions concerning TVI regardless of the percentage of ownership shares held by a Member.

138. Dr. Taylor and TVI breached the Operating Agreement and Amendment by failing to pay Hart the complete distribution owed to it for each month starting in June 2022 and continuing through the present, and also by excluding Hart from decisions regarding the management of TVI.

139. From June 2022 through January 2024, Hart owned 25% of the company and was entitled to the contractually required distribution amount.

140. Even if the 2024 Redemption Agreement is enforceable, Hart retained 5% ownership interest in TVI.

141. From February 2024 through present, Hart has continued to own 5% of TVI and should have continued to receive a 15% distribution. Based on available information, Hart should

have received at least $393,188 in distributions from February to December 2024, and an unknown amount in 2025.

142. As a direct and proximate result of Dr. Taylor's breach of the Operating Agreement and the May 2, 2022, Amendment, Hart has been damaged in an amount to be proven at trial but in no event less than $75,000, representing the unpaid distribution amounts owed Hart.

**COUNT VII – UNJUST ENRICHMENT**
(Hart vs. Defendants)

143. Plaintiffs incorporate the previous paragraphs as if fully set forth here.

144. Peel conferred benefit on Defendants in working increasing numbers of hours for TVI and taking on increasing responsibilities at TVI without a corresponding increase in shares or distribution of the company, and eventually with a decrease in distribution amount.

145. Defendants were aware of this benefit as Dr. Taylor asked Peel to take on additional work, to forgo other commitments, and Dr. Taylor eventually asked Peel to dedicate full-time hours to TVI.

146. Defendants retained benefits of Peel's efforts to help establish and grow TVI to the point that the company was attracting potential buyers, and to where, under the circumstances, it is inequitable for Defendants' to retain the benefits of Peel's efforts without payment.

**COUNT VIII – BREACH OF FIDUCIARY DUTY**
(Plaintiffs vs. Dr. Taylor)

147. Plaintiffs incorporate the previous paragraphs as if fully set forth here.

148. A fiduciary relationship existed between Dr. Taylor and Plaintiffs.

149. Dr. Taylor held a position of trust and power by virtue of blood and business relationship with Peel.

150. Peel placed a special trust and confidence in Dr. Taylor, which Dr. Taylor repeatedly exploited.

151. Dr. Taylor was a majority owner of TVI and owed fiduciary duties of loyalty and care in addition to duties of candor and good faith to Hart as a minority member.

152. Dr. Taylor breached his duties when he misrepresented the nature of the business and interest of the Patterson Companies and the value of TVI, and pushed Peel out of TVI.

153. Dr. Taylor caused Peel to sell his ownership interest in TVI at a significantly depressed value.

154. Dr. Taylor also breached his duties when he failed to treat Hart as an owner in TVI and failed to pay Hart distributions.

155. As a direct and proximate result of Dr. Taylor's breaches Plaintiffs have been damaged in an amount to be proven at trial but in no event less than $75,000.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants in an amount exceeding $75,000, plus punitive damages, pre- and post-judgment interests, attorneys' fees, costs, and any other relief as is just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs request a jury trial on all counts in Kansas City, Kansas.

Respectfully submitted,
SPENCER FANE LLP

*s/ Mark A. Cole*

Mark A. Cole, KS #25349
Alexis H. Denny, KS # 29752
6201 College Boulevard, Suite 500
Overland Park, KS 66211
Tel: (913) 345-8100
Fax: (913) 345-0736
mcole@spencerfane.com
adenny@spencerfane.com

*Attorneys for Plaintiffs*